1           UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3                     No. 1:11-cv-10876-MLW

4

5  BOSTON PRIVATE BANK & TRUST COMPANY,
            Plaintiff
6

7  vs.

8

9  TODD RASSIGER and FIRST REPUBLIC BANK,
            Defendants
10

11                  * * * * * * * * *
12

13
                  For Hearing Before:
14              Chief Judge Mark L. Wolf

15
           Motion for Preliminary Injunction
16

17              United States District Court
                District of Massachusetts (Boston)
18              One Courthouse Way
                Boston, Massachusetts 02210
19              Wednesday, June 22, 2011

20
                     * * * * * * * *
21

22         REPORTER: RICHARD H. ROMANOW, RPR
               Official Court Reporter
23           United States District Court
      One Courthouse Way, Room 5200, Boston, MA 02210
24             bulldog@richromanow.com

25

```
 1                  A P P E A R A N C E S

 2    RICHARD D. GLOVSKY, ESQ.
      DAVID C. KURTZ, ESQ.
 3       Edwards Angell Palmer & Dodge, LLP
         111 Huntington Avenue
 4       Boston, Massachusetts 02199
         (617) 239-0214
 5       Email: Rglovsky@eapdlaw.com
      and
 6    MARGARET WARNER CHAMBERS, ESQ.
         Executive Vice President and General Counsel
 7       Boston Private Bank
         Ten Post Office Square
 8       Boston, Massachusetts 02109
         (617) 646-4822
 9       Email: Mchambers@bostonprivate.com
         For plaintiff
10

11    DOUGLAS S. BROOKS, ESQ.
      JOHN J. COMMISSO, ESQ.
12       LibbyHoopes, P.C.
         175 Federal Street
13       Boston, Massachusetts 02110
         (617) 338-9300
14       Email: Dbrooks@libbyhoopes.com
         For Defendant Todd Rassiger
15

16    BARRY A. GURYAN, ESQ.
         Epstein, Becker & Green, P.C.
17       160 Federal Street, 6th Floor
         Boston, Massachusetts 02110
18       (617) 737-3538
         Email: Bguryan@ebglaw.com
19    and
      AIME DEMPSEY, ESQ.
20       Epstein Becker & Green, P.C.
         250 Park Avenue
21       New York, New York 10177-1211
         (212) 351-4500
22       Email: Ebglaw.com
         Pro hac vice for Defendant First Republic Bank
23

24    ALSO PRESENT: (Via telephone.)  EDWARD DOBRANSKI, ESQ.
         Vice-President and General Counsel, First Republic Bank
25
```

```
 1                    P R O C E E D I N G S
 2              (Begins, 10:30 a.m.)
 3              THE CLERK:  Case Number 11-10876, Boston
 4    Private Bank & Trust versus Todd Rassiger, et al.  The
 5    Court's in session.  You may be seated.
 6              THE COURT:  Good morning.  Would counsel
 7    please identify themselves for the Court and for the
 8    record.
 9              MR. GLOVSKY:  Good morning, your Honor.
10    Richard Glovsky for the plaintiff, Boston Private Bank.
11              MR. KURTZ:  David Kurtz for the plaintiff,
12    Boston Private Bank.
13              MR. GLOVSKY:  And, your Honor, with us is
14    Megan Chambers who's General Counsel at the bank.
15              THE COURT:  Thank you.
16              MR. BROOKS:  Good morning, your Honor.  Doug
17    Brooks for the defendant Todd Rassiger.
18              MR. COMMISSO:  Good morning, your Honor, John
19    Commisso for Mr. Rassiger.
20              MR. GURYAN:  Good morning, your Honor, Barry
21    Guryan for First Republic Bank.
22              MS. DEMPSEY:  Good morning.  Aime Dempsey for
23    First Republic Bank, admitted pro hac.
24              THE COURT:  And who do we have on the
25    telephone?
```

```
 1              MR. GURYAN:  Your Honor, we have Mr. Ed
 2   Dobranski, who is the Vice-President and General Counsel
 3   of First Republic.
 4              THE COURT:  And, Mr. Dobranski, can you hear
 5   us?
 6              MR. DOBRANSKI:  I can hear you fine.  I can
 7   hear you, your Honor, very well.  The other guys are a
 8   little bit muted.
 9              THE COURT:  Well, I will encourage them to
10   speak into the telephone.
11         And is from Rassiger here as ordered?
12              MR. BROOKS:  He is, your Honor.
13              THE COURT:  Where is that?
14              MR. RASSIGER:  Right here, your Honor.
15              THE COURT:  All right.
16         There were some filing made yesterday,  a
17   supplemental status report for Mr. Rassiger and the
18   plaintiff filed a motion for a preliminary injunction
19   with regard to First Republic.
20         Is there anything else that was recently filed
21   that I should have received and read?
22              MR. BROOKS:  No, your Honor.
23              MR. GLOVSKY:  No, your Honor.  Although we do
24   have additional affidavits should the Court inquire on
25   certain subjects today.
```

```
1                THE COURT:  All right.  Well, First Republic,
2    of course, hasn't had an opportunity to respond to the
3    motion for a preliminary injunction directed to it,
4    however, if a preliminary injunction issues against
5    Mr. Rassiger, First Republic would be enjoined as a
6    person acting in concert with Rassiger under Rule
7    65(d)(2)(C) in any event.  So I think the focus will
8    remain on the motion concerning Mr. Rassiger.
9        First Republic does have to respond to the
10   complaint.  I think it was filed about --
11               MR. GURYAN:  Your Honor, it was filed June 3rd
12   and an answer is due June 29th.
13               THE COURT:  Okay.
14               MR. GURYAN:  That was an amended complaint.
15               THE COURT:  Correct.  And I expect we'll be
16   discussing scheduling after I resolve the preliminary
17   injunction issue.
18        I'm well familiar with the submissions and I
19   think it would be helpful, though, for me to get an
20   update on your views on certain questions.  The
21   defendant contends that a preliminary injunction is not
22   necessary.  I'm interested in your respective views on
23   that and on whether if I do proceed as I expect I will,
24   Mr. Rassiger wants to testify.  I'm certainly open
25   minded but I'm skeptical about some of the
```

1    representations made in his declaration concerning his

2    motives or state of mind when he took these many

3    documents which are, at the moment, appear to me to

4    include trade secrets.

5         I'm interested in knowing, if I do issue a

6    preliminary injunction, what it should enjoin.  I'm

7    interested in knowing what the remaining discovery

8    dispute would be to be resolved if the preliminary

9    injunction issues or perhaps if it doesn't.  I might

10   employ the magistrate judge for that.  And I'm

11   interested in knowing who the clients A and B are and

12   why their names shouldn't be in the record.  They're

13   obviously going to be witnesses in this case.  And if

14   there is a reason to keep their identity out of the

15   public record, it needs to be part of the record, I

16   think, in some fashion.

17        But, Mr. Glovsky, do you want to start by

18   addressing those preliminary issues.

19             MR. GLOVSKY:  Certainly, your Honor.  I think

20   it's very clear, your Honor, that Mr. Rassiger, um,

21   committed a theft here and that he knowingly did so.

22   And ever since he committed that theft -- and I think

23   that when you're referring to Mr. Brown's affidavit, it

24   appears that he did so on at least six dates, nine

25   different times.  So -- and even he acknowledges, your

1  Honor, that he did take material that perhaps he

2  shouldn't have taken.  And the reason that we

3  particularly need the injunction is because he, and I

4  would submit the bank, the First Republic Bank, too,

5  have proven, in the short duration of this case, that

6  they cannot be trusted with the documentation that

7  Mr. Rassiger took from Boston Private Bank.

8       Among other things your Honor, um, we have

9  recently learned that Mr. Rassiger wiped clean two of

10  the flash drives onto which he downloaded information,

11  obviously transferring them someplace else in attempting

12  to hide his theft.

13       Also, you may recall that in his affidavit that he

14  submitted in his declaration he said he had the three

15  flash drives.  Well, it turned out -- and we said he had

16  four.  It turned out he did have four.  And after we

17  attempted to engage in trying to ascertain what, in

18  fact, he had taken and after representatives from my

19  firm and the bank's expert, as well as Mr. Rassiger,

20  spent quite a bit of time at his home one night making

21  copies, which we haven't yet seen, which I can explain

22  to the Court in a minute, but making copies of his

23  personal computers, low and behold a few days later we

24  got a note from counsel telling us, "Oh, we found

25  another flash drive onto which he downloaded" --

```
 1              THE COURT:  And was that after you had told
 2    them that you believed that there were four, not three?
 3              MR. GLOVSKY:  That's correct.  So there's no
 4    reason -- and there are many other reasons that I think
 5    are fairly pronounced in what we presented to the Court
 6    to suggest that neither Mr. Rassiger nor his new
 7    employer can be trusted with anything other than an
 8    injunction.
 9              THE COURT:  All right, that flushes out what I
10    inferred would be your concern and the essence of your
11    argument.  Mr. Brooks?
12              MR. GLOVSKY:  And I would also mention, your
13    Honor, that there is -- in the information he took
14    there's a great deal of personal information, data about
15    clients, individuals, all of which is extraordinarily
16    sensitive.  So there's a public interest involved here,
17    too.
18              MR. BROOKS:  Just to address those issues,
19    your Honor.  We've also looked at these flash drives and
20    our experts, after a preliminary review anyway, don't
21    find any evidence that these were wiped clean.  And I'm
22    not sure what that refers to, your Honor, but that's not
23    the report we got.  We did get a letter late last night
24    from them saying they found that -- I'm a lay person
25    obviously but I understand that sometimes on preliminary
```

1    reviews that can show up and it turns out that's not the

2    case, so we do not agree with that, your Honor.

3         In terms of the flash drives, it's a little hard

4    for me to say because I came in late in the day, but

5    this is the first I've heard that they said there was a

6    missing flash drive.  Mr. Rassiger found a flash drive

7    on his own and gave it to them.  So I'm not sure how

8    that can possibly be evidence of bad faith.  They didn't

9    know about this.  He said, "I found it here.  Copy this

10   one as well."

11        THE COURT:  Okay.  Well, I'm prepared

12   essentially to decide the motion for a preliminary

13   injunction on the record as it exists, but, I'm sorry,

14   Go ahead.  We do have another party.

15        MR. GURYAN:  Yes, please, your Honor.

16        I just wanted to point out that on July 3rd, as

17   you know, the complaint was amended to add the bank,

18   First Republic, and after 18 days, yesterday they

19   decided to make a motion for a preliminary injunction

20   against the bank.  In fact, if you look at the affidavit

21   that's attached to Mr. Rassiger's declaration from

22   Katherine August-deWilde, she says specifically that

23   their bank didn't use the information, they didn't rely

24   on the information, they didn't get any --

25        THE COURT:  I think it says the opposite, it

1    says that she got information about the interest rates

2    from both Mr. Rassiger and the clients, A and B.

3              MR. GURYAN:  I'm sorry.  With respect to the

4    clients, it's clear that Client A approached

5    Mr. Rassiger after he came to First Republic and --

6              THE COURT:  What makes that clear to me, that

7    Mr. Rassiger told me in his affidavit?

8              MR. GURYAN:  There's no evidence that --

9              THE COURT:  I know, but this is on a

10   preliminary injunction.  I'm sitting here with

11   substantial evidence that Mr. Rassiger is a thief.

12        Look, I'm happy to hear from him, but I'm not

13   considering the motion for a preliminary injunction with

14   regard to the bank which is on the conversion theory

15   that hasn't been briefed by anybody.

16             MR. GURYAN:  Well, I --

17             THE COURT:  Let me finish.  You're going to do

18   better if you listen to me.

19        However, the bank hired Mr. Rassiger.  The bank

20   would, in the ordinary course, be covered as a person

21   acting in concert with him if I enjoin him, and that's

22   the way it's going to work.  And it's very important --

23   I think somebody could have got here from San Francisco

24   by now and I realize, because I've just finished a

25   7-week trial and started focusing on this more

1    yesterday, that you didn't have that much notice.  So

2    it's fine.  But the bank's a party and the bank is a

3    person acting in concert with Mr. Rassiger anyway, so

4    I'm going to focus on the Rassiger matter and we'll go

5    from there.

6              MR. GURYAN:  I just wanted to say for the

7    record that there are no facts, it's all speculation

8    against the bank.

9              THE COURT:  Mr. Rassiger is the bank.  He was

10   their employee.  If he misused the trade secrets, he was

11   acting on behalf of the bank.

12             MR. GURYAN:  Your Honor, there's no evidence

13   that he misused it and there is evidence that he

14   received -- that Ms. DeWilde received this information

15   and undercut, made a low-ball offer to get the

16   business.  There's no evidence they relied on any of

17   this information.

18        And I also would say that the injunction that was

19   proposed -- even though it just came in yesterday, is

20   incredibly broad.

21             THE COURT:  Well, that actually was something

22   I wanted to get to.  I want to understand at the

23   beginning the scope of the injunction I'm being asked to

24   issue.  However -- however, um, Mr. Brooks, I'm not

25   persuaded that the issue is moot, although it would

1  permit me to get back to other things, if I was, and

2  I've told you I'm skeptical, for reasons I'm going to

3  describe, but I'm going to listen to your argument about

4  Mr. Rassiger's written explanation as to how what

5  appeared to me to be trade secrets, you know, came into

6  his possession.  I don't know whether you're requesting

7  that he get a chance to testify in view of that

8  skepticism.  Of course, if he testifies, his testimony

9  has to be truthful.

10          MR. BROOKS:  No, your Honor, we weren't

11  planning to have him testify and he's here because of

12  the order.

13          THE COURT:  Yes, and I may want to hear from

14  him depending on how the argument evolves, but I

15  understand you're not asking and, at the moment, it's my

16  present intention to decide the matter based on the

17  written submissions, which are thoughtful and thorough.

18      What is -- Mr. Glovsky, what is the scope of the

19  injunction you're now -- the preliminary injunction that

20  you're now seeking?

21          MR. GLOVSKY:  Yes, your Honor.  Preliminarily

22  what we want to make sure occurs or does not occur is

23  that any information that Mr. Rassiger obtained from the

24  bank is not utilized, is not disseminated, and

25  ultimately -- and your Honor may feel at this point

1    maybe this isn't the Court's decision -- it's not the

2    time for the Court to make this decision, but that

3    ultimately that it be expunged, returned and otherwise

4    there would be no trace left either in Mr. Rassiger's

5    possession or in First Republic's possession of any of

6    this information that he took.

7         THE COURT:  And that might be a timing issue,

8    but -- and to the extent there are trade secrets, I

9    think it's First Republic's position that it hasn't used

10   them and it doesn't intend to use them, and it might be

11   prudent for them just to expunge it and satisfy you they

12   expunged it and that would materially reduce the risk

13   that they'll get embroiled in litigation about whether

14   they've been in contempt of any injunction, if I issue

15   one.

16        But, I mean, I thought that part of what you want

17   is -- in the preliminary injunction, is an order

18   restraining the defendants or anybody acting in concert

19   with them from deleting any electronic files or

20   destroying any documents that came from Boston Private

21   Bank.  Is that part of it?

22        MR. GLOVSKY:  Yes, it is, your Honor.

23        THE COURT:  And you're seeking the return of

24   documents and information that you say are trade

25   secrets.  I guess I'd have to consider whether that's

1    appropriate on a preliminary injunction.  You wanted

2    originally a designated forensic computer expert to have

3    access to all the flash drives used to download.  Has

4    that already occurred?

5              MR. GLOVSKY:  At this point, based on

6    representations of counsel, without having examined

7    Mr. Rassiger under oath in a deposition, um, our

8    understanding is, yes, we have the four flash drives and

9    we have reviewed them and preliminary reports include,

10   as I mentioned, the fact that apparently two of them

11   have been wiped.

12             THE COURT:  And you're asking for access to

13   Mr. Rassiger's personal computers and e-mail accounts by

14   your expert.  Has that occurred?

15             MR. GLOVSKY:  That has not occurred.  What has

16   occurred is there has been an imaging of them, but we

17   couldn't seem to break the logjam over our review of

18   what was imaged.  So at the moment there is a code that

19   prevents us from reviewing them.  Mr. Kurtz has been

20   more involved in that part of the case than I have, your

21   Honor, and he can explain some of the technicalities

22   relating to that, but the bottom line is that the

23   protocol that's been offered to us to review them we

24   feel is inadequate because it would allow Mr. Rassiger

25   to continue to conceal documents that he took from the

```
 1   bank.
 2              THE COURT:  All right, so that's still a live
 3   issue.
 4              MR. GLOVSKY:  That is still a live issue.
 5              THE COURT:  You want an accounting of the
 6   information and documents obtained, is that correct, you
 7   still want that?
 8              MR. GLOVSKY:  Yes, please.
 9              THE COURT:  And what is it -- what is it --
10   what, in addition, are you seeking in the motion that
11   you filed yesterday concerning First Republic?
12              MR. GLOVSKY:  Well, essentially the same
13   relief from First Republic, your Honor, so that this
14   information is, at the very least, safeguarded and not
15   disseminated until the Court gets to the merits of the
16   case.
17              THE COURT:  All right.
18         And, Mr. Brooks, how do you perceive the discovery
19   issues or the parameters of the injunction?  I mean,
20   there are two questions, one, whether there should be a
21   preliminary injunction or not, and you say, "Well, we've
22   agreed to it, so there's no need for an injunction," and
23   open to considering all of this, but what about the
24   scope of -- because I just haven't seen a written
25   agreement signed by the parties, for example.
```

```
 1           MR. BROOKS:  Well, do you want me to for now
 2    leave aside the argument why I don't think a preliminary
 3    injunction is --
 4           THE COURT:  Yes, I'm just trying to figure out
 5    what's in dispute substantively.
 6           MR. BROOKS:  Well, as I see it, in terms of an
 7    order that he not use or disclose any of the Boston
 8    Private information or that he not destroy it, um, we've
 9    agreed to that -- first of all, destroying it he
10    obviously couldn't do under the rules of spoliation.
11    Not using it, we've agreed that --
12           THE COURT:  Also, under the laws that
13    prevent -- all right.  Go ahead.  Go ahead.
14           MR. BROOKS:  And we've made representations,
15    if that's the case, we've offered, you know, to enter
16    into a stipulation and file it with the Court.  So
17    that's not -- in terms of the scope, that's not an
18    issue.
19           The accounting, I think the tough part with that
20    is we just need some clarification because one thing
21    that Mr. Rassiger has been, um, very careful about doing
22    is not -- you know, making sure not to look at anything
23    that could be on his personal computers related to
24    Boston Private, which he would need to do to make an
25    accounting.  I'm not really sure if -- I mean, they know
```

1    exactly -- as I understand from the papers their

2    forensic review is an accounting.  So I won't object to

3    that in principle, I just think that it causes problems

4    and that you would have to review those at this time and

5    I don't think they want that.

6         In terms of the issue about purging things, again

7    it's a little mutually exclusive with making sure that

8    he doesn't destroy anything, we had offered -- we, being

9    Mr. Rassiger's former counsel, before he got involved,

10   initially to destroy everything so that he couldn't have

11   access to it and Boston Private took the position, which

12   I understand, that, "No, no, no, that would be

13   spoliation," so we didn't do that.

14         I think the real issue, your Honor, is in terms of

15   what to do with the mirror images of Mr. Rassiger's

16   computers and then the analogous issue of what to do

17   with his personal e-mail accounts.  And in terms of the

18   personal computers, we have -- we've issued -- we

19   submitted a forensic review protocol, which is attached

20   to our supplemental status report.  Your Honor, I could

21   try to explain it in lay terms about what -- about

22   basically what we're operating?

23              THE COURT:  Okay.

24              MR. BROOKS:  Just quickly.  There are these

25   mirror images and what we've said is -- we've invited

 1    Boston Private to, you know, give us search terms so we

 2    can search the computer for whatever -- give us whatever

 3    search terms you want that you think are going to be --

 4    are going to pull up of relevant documents.  In the

 5    first instance we will do -- our experts will do a

 6    search pulling out and get a list of all the documents

 7    that it pulls out.  We will segregate any attorney-

 8    client privileged communications and any irrelevant

 9    personal documents, because these are family home

10    computers.

11         What we will do then is then invite their experts

12    into the second search, with those segregated, so they

13    can see how the search went and they can see that

14    they're getting all of these relevant documents.  In the

15    meantime in terms of the -- what we would think would be

16    sort of false/positive hits, there would be two

17    categories, attorney-client privileged communications

18    and personal -- irrelevant and personal documents.

19    We'll log all of those.  So we won't just make a

20    privilege log, we will also update a log with sufficient

21    detail of "Hey, here's why this document was hit on, but

22    here's why it's not -- here's why it's personal," so

23    that they could challenge that.  And within that that's

24    the lay explanation.

25         Apparently the experts -- there's all sorts of

1   ways to electronically tag these documents to satisfy
2   the experts that they know exactly what is not being
3   produced and that there would be no issue later about
4   recreating the search to deal with what -- what we again
5   we would deem as false positives.
6        The issue, your Honor, is -- as I read, the only
7   proposal we have from them, I think, is their proposed
8   order which would just give them access to the computer
9   in the first instance.  And I've looked, your Honor, and
10  in terms of the case law, it appears what we're
11  offering, especially at this stage, is far ahead of the
12  curve and I would just --
13       THE COURT:  Well, I'm actually -- I'm just
14  trying to find out what's in dispute.  As I said, if I
15  issue the injunction and then there's a question where
16  to go from there, then I may have the Magistrate Judge
17  deal with that issue.
18       MR. BROOKS:  Okay.  Sorry, your Honor.
19       THE COURT:  No, this is very helpful.  That's
20  very responsive.  I just want to make sure I understand
21  the terms.  A "mirror image" is what, a complete copy of
22  the hard drive or the information on the computer?
23       MR. BROOKS:  Yes, and so not just documents,
24  but also all the relevant meta data.  And the same --
25  the functional equivalent of a mirror image -- and I'm

```
 1   not sure if it's called a "mirror image" or not, of his

 2   personal e-mail accounts -- because these are g-mail

 3   accounts so they don't actually reside on the computer,

 4   they reside in the clouds, as they say, that has been

 5   copied in the same and the functional equivalent of

 6   mirror image in --

 7             THE COURT:  And is there -- that all of the

 8   discussion so far is focused on computerized records,

 9   which I understand can be printed out, but are there any

10   other documents about which the plaintiff is concerned?

11             MR. GLOVSKY:  Yes, your Honor.  Of course,

12   hardcopies may have been made of any of these documents.

13             THE COURT:  Yes, but other than the

14   hardcopies, are there any documents at issue that don't

15   come from computerized records that you know of?

16             MR. GLOVSKY:  I don't believe so.

17             THE COURT:  Okay.  And --

18             MR. GLOVSKY:  May I have a minute, your

19   Honor?

20             THE COURT:  Yes.

21             MR. BROOKS:  Your Honor, I'm not sure if I was

22   clear --

23             THE COURT:  Just hold on a second.

24             MR. BROOKS:  Oh, I apologize.

25             (Pause.)
```

```
 1          MR. GLOVSKY:  We don't know all that
 2   Mr. Rassiger did.  We know about 1500 documents that he
 3   downloaded.  So what we're looking for, your Honor, is
 4   something that encompasses whatever it was he took in
 5   whatever form he took it.
 6          THE COURT:  Okay.  And I think First Republic
 7   expressed some concern about the scope of a possible
 8   order?
 9          MR. GURYAN:  Yes, your Honor.  Let me just
10   make two points on that.  And that is that --
11          MR. DOBRANSKI:  Excuse me, your Honor.  Could
12   you ask Mr. Guryan to speak up?
13          THE COURT:  Yeah, talk right into that
14   microphone.  Your client wants to hear what you say.
15          MR. GURYAN:  Yes, I'm away from the
16   microphone.  Sorry.  Can you hear me now?
17          THE COURT:  Is that better?
18          MR. DOBRANSKI:  Yes.  Thank you.
19          MR. GURYAN:  With respect to the order, your
20   Honor, it is very broad and covers public information,
21   an example would be Paragraph Number 3, any information
22   that has to do with Boston Private.  You can look on the
23   Internet and find information about Boston Private.  All
24   that does is stifle competition and we think that's --
25          THE COURT:  And that's valuable.  But if I
```

```
 1    find that trade secrets were taken, I would probably
 2    issue an order that covered everything he took and if
 3    some of it's public, um, that would be unfortunate, but
 4    I don't know how at this point, um -- a preliminary
 5    injunction has to describe with specificity what is done
 6    and we're not going to do a document-by-document
 7    analysis of trade secrets.  But actually it's -- I don't
 8    mean to discourage you from raising these things, it's
 9    very helpful, and there probably are ways that I could
10    write it including, you know, that "You can't use any
11    documents or information taken from, um, the plaintiff,
12    but if the information is also available from public
13    sources and is obtained from those sources, it's -- it
14    can be used."
15            MR. GURYAN:  My point, your Honor, was it's
16    not limited to documents that were taken from Boston
17    Private, it just said it's including documents, so it's
18    broader.
19            THE COURT:  Okay.
20            MR. GURYAN:  The last point is of great
21    concern to First Republic because what they're asking is
22    that an expert of a competitor roam around First
23    Republic's computers to see what it could find.  Now,
24    this is no different than a discovery request where you
25    have a discovery and you develop a targeted approach.
```

1  And this is what we've been doing for the last three-

2  plus weeks with our experts is trying to identify and

3  turn over everything we could.  So this would simply be

4  a targeted approach much like what Mr. Brooks identified

5  as just an orderly way to -- either through search terms

6  or other terms that our experts can suggest and rely on

7  and so that a competitor is not just take a fishing

8  expedition.

9         THE COURT:  All right.  This is just what I

10  was looking for.

11      And why should these customers be called "A" and

12  "B"?

13         MR. GURYAN:  Your Honor, from our standpoint,

14  we didn't start that.

15         THE COURT:  I know, that was really for

16  Mr. Glovsky.

17         MR. GLOVSKY:  Your Honor, just to protect

18  their identity, these are private schools, and we did

19  that because, you know, we thought there may be some

20  sensitivity of them appearing in --

21         THE COURT:  Well, this is a reason I think you

22  ought to resolve the case.  Any time there's litigation

23  that puts clients there, you're not the only two lenders

24  in the world and you run the risk of your clients

25  playing on both of your houses.  But I'll call them "A"

1    and "B" for today, but, you know, obviously they're

2    going to be the subject of discovery if this case

3    endures and there's no contention, I think, that they

4    did anything wrong, so there has to be a reason to seal

5    something and I don't see it at the moment.  But that

6    doesn't have to get resolved right this minute.

7         All right.  Well --

8         MR. GLOVSKY:  Your Honor, just to respond to

9    one point Mr. Guryan made.  There's been no proposal

10   that I'm aware of insofar as First Republic's bank

11   documents are concerned and obviously, I think to some

12   extent, First Republic by its association with

13   Mr. Rassiger and I think their knowledge of what he did

14   -- and by the way your Honor should know that

15   Mr. Rassiger, that there is yet another employee, Betsy

16   Sullivan, who recently left the bank and went over to

17   First Republic and also downloaded documentation onto

18   two flash drives which we are now reviewing.

19        So there's a lot of culpability on the other side

20   of this case, I would submit, and to some extent anyway

21   I think they had forfeited, as a result of that

22   culpability, some of the prerogatives that they might

23   otherwise be entitled to.

24        THE COURT:  All right.  The -- let's get to

25   the merits of this.  If I don't issue an injunction, the

1  scope of it is moot.

2       Well, it's my tentative view that an injunction is

3  warranted.  I perceive there's a strong likelihood of

4  success on the merits of the misappropriation of trade

5  secret and breach of fiduciary duty claims.  The federal

6  claim raises some issues but -- about what "exceeding

7  the scope of authorized access" means, but I think the

8  First Circuit, as opposed to perhaps the Ninth Circuit,

9  seems to be going in the plaintiff's direction.  I do

10  think, at the moment, and this is all tentative, that

11  there is a sufficient showing of irreparable harm.  A

12  strong showing of likelihood of success on the merits

13  diminishes the degree of irreparable harm or the

14  strength of the showing of irreparable harm that needs

15  to be demonstrated.  But as a practical matter, in this

16  case I don't think there would be an adequate remedy at

17  law.

18       There are going to be contentions about whether it

19  was public information or private information that was

20  used and how to value the loss of goodwill that comes

21  with confidential client files being taken.  And I don't

22  think there is at the moment, you know, genuine hardship

23  to Boston Private Bank.  I don't see the cognizable

24  hardship to Mr. Rassiger or his employer at the moment

25  if he's prohibited from using trade secrets and there's

```
 1    certainly a public interest in not permitting stolen

 2    confidential information to be used for someone's

 3    competitive disadvantage.

 4        And this is an equitable remedy, as I say, and I

 5    can get into the details, but Mr. Rassiger's explanation

 6    that he just took these things having a vague notion

 7    that it would be nice to have the forms or he took some

 8    pride of authorship doesn't ring true to me.  Some of

 9    these things were Boston Private Bank's ratings of the

10    clients, for example.

11        So that's my present state of mind.  I'm leaning

12    against the defendant.  I feel like I'm fairly familiar

13    if not familiar with the submissions.

14        Mr. Glovsky, I can let you go first or I can let

15    Mr. Brooks go first and give you a chance to respond.

16            MR. GLOVSKY:  I'm happy to allow Mr. Brooks to

17    go first, your Honor.

18            THE COURT:  Go ahead.

19            MR. BROOKS:  Thank you, your Honor, and I'll

20    try to be brief.

21            THE COURT:  You don't have to be brief.  It's

22    important.  I've studied what's in there, but you know

23    this much better.

24            MR. BROOKS:  What I think is critically

25    missing from their argument in their motion and
```

1   ultimately their claims is that they don't explain, much

2   less provide any evidence, of how Mr. Rassiger's

3   possession or more importantly his alleged use of any of

4   this information caused them any harm.  And this is not

5   a case, your Honor, about a former employee stealing the

6   secret recipe and going off and giving it to his new

7   employer and it's also not a case about a salesperson,

8   you know, taking a customer list of thousands of

9   nameless customers and being able to then use that to

10  compete.  What this is a case about in their papers,

11  your Honor, is two customers, two customers, both of

12  whom were well-known to Mr. Rassiger, one who ended up

13  switching banks based on more favorable interest rates

14  and the other who stayed with Boston Private and got the

15  more favorable interest rate.

16       Now, it's undisputed, if you look at the papers,

17  that the customer's decisions in terms of the one that

18  switched banks, it was all based on a lower interest

19  rate.  And Boston Private itself describes these

20  interest rates as unusually low.  So this is not -- and

21  this is based on their papers, you don't have to take

22  our word for it, but this is not a case where, based on

23  the information that Mr. Rassiger took, he was able to

24  make subtle undercuts of prices, which you see in a lot

25  of these cases.  They admit these were unusually low

1    interest rates.  Nothing in these documents could have

2    provided any advantage to Mr. Rassiger.  He knew these

3    --

4              THE COURT:  Why -- I guess I have a couple of

5    questions.  You know, why take them if they're useless,

6    (A) and (B) I mean one of the -- do I remember right

7    that part -- that some of the documents he took had

8    Boston Private Bank's ratings of the clients?

9              MR. BROOKS:  A couple of things.  In terms of,

10   yes, there were ratings, this goes to a point you made

11   before.  There were things such as ratings and I think

12   your Honor questioned, understandably, "Well, how does

13   that fit into this kind of vague notion of using them

14   as" -- We're not talking about documents that there was

15   just a rating document, what this was was sort of an

16   untargeted approach in terms of Mr. Rassiger taking a

17   document because it had, for instance, some form

18   language and because he wasn't giving it a lot of

19   thought though --

20             THE COURT:  If you want me to rely on that

21   contention, then Mr. Rassiger's going to go on the

22   witness stand and be cross-examined.

23             MR. BROOKS:  I understand.

24             THE COURT:  I know it's hard, you know, to

25   make -- it's not the best way to make credibility

1   judgments on a paper record.  I'm offering him the

2   opportunity and Mr. Glovsky or somebody can cross-

3   examine him and I might even have a question for him.

4   But I don't, at the moment -- and I'm just trying to be

5   as transparent as possible, think he took these 1500

6   documents because he had pride of authorship and an

7   interest in the forms that he developed and it just

8   happened to get the confidential rating information.

9          MR. BROOKS:  I understand, your Honor, and I

10   didn't intend to go there because I don't want him up

11   there.  I was trying to answer the question you posed,

12   but I understand we'll -- we'll rely on the record and I

13   understand where your Honor comes down on this.

14          But so, again, rather than focus on that, focusing

15   on what Boston Private's papers say, they admit that

16   this process -- this is an open bidding process.  These

17   clients, in other words, say, "Hey, here's what this

18   bank is offering you.  Can you beat it?  Can you match

19   it?"  So I understand there's a skepticism, "Well, why

20   did you have those documents?"  But their own papers

21   demonstrate that the documents that they claim to be

22   interested in had no impact on the alleged harm that

23   they claim befell them, your Honor.

24          So even if you were to find that, um, what

25   Mr. Rassiger -- ultimately what Mr. Rassiger downloaded,

1   based on their papers, constituted trade secrets, I

2   don't think they can meet the burden of showing

3   likelihood of success on the merits because they haven't

4   established that they were harmed by that.  And, in

5   fact, their own papers seemed to belie that conclusion

6   because they say this First Republic Bank came in and

7   started offering these crazy low interest rates.

8            THE COURT:  Well, one of the things that

9   occurred to me as I was reading this is I think the

10  papers say that Mr. Rassiger worked with what 25 private

11  --

12           MR. BROOKS:  Yeah, in the neighborhood, yes.

13           THE COURT:  And so why were these two targeted

14  by him?  I mean, frequently intent, causation, at a

15  preliminary stage -- well, intent or state of mind

16  frequently has to be proven by circumstantial evidence

17  and here we're on a motion for preliminary injunction,

18  neither of you have given me an affidavit from A or B

19  saying it's exactly the way Mr. Rassiger said or it's

20  different.  I'd have to decide based on the record and,

21  you know, eventually have a trial, if a trial is

22  necessary, and there would be a fuller record and the

23  facts might come out differently.  But, you know, why

24  these two and not the other 23?

25           MR. BROOKS:  Are you asking me?

1          THE COURT:  Yes.

2          MR. BROOKS:  Well, if anything, your Honor, I

3     would think the fact that he has only made -- he has

4     only made it two is to support Mr. Rassiger's thinking

5     that this wasn't a -- I mean, typically in these cases

6     what you see is somebody goes out and just starts -- I

7     can tell you -- I can try to provide an answer, but I

8     think it might just lead your Honor -- it's back to the

9     declaration and I know you don't want to get into that.

10          THE COURT:  No, you can go back to the

11     declaration.

12          MR. BROOKS:  Well, I think, in terms to

13     Customer A there was an initial, um -- at least the

14     first contact between Mr. Rassiger and Customer A was

15     Customer A reaching out to Mr. Rassiger, which then led

16     to a conversation about interest rates.  As I understand

17     it, with Customer B, that was a customer already known

18     to First Republic.  And so that's how those two came

19     into being.  So that's why it's two of the 25.

20          And I think that's an important point.  If you

21     really had the keys to the kingdom, wouldn't this have

22     been Customers A through Y, if there were 25, and that's

23     not what happened.

24          THE COURT:  At this point there hasn't been

25     any discovery and I don't know whether, you know, C, D,

1   and E were contacted or just didn't mature into

2   something that the plaintiff knows about.

3            MR. BROOKS:  But I think that's right, they

4   would certainly know about them if they lost the

5   business.  And there's no -- Mr. Rassiger is not subject

6   to a non-compete or a nonsolicitation, so he's allowed

7   to reach out to these people.  And again if these

8   documents really were as important as Boston Private

9   make them out to be, he could steal all of their clients

10   and it would be that simple.  But that's not the way it

11   works.  Frankly it comes down to -- and I think their

12   own papers support this, "Who's going to give me the

13   best interest rate and I'm going to use banks against

14   each other.  I'm going to tell this bank, 'Hey they're

15   giving me this, here's the term sheet, beat it'."

16       So ultimately, your Honor, I think that while

17   there's no argument that Mr. Rassiger took documents,

18   there will likely be a dispute about whether or not they

19   constitute trade secrets or they're confidential,

20   respectfully I don't think plaintiffs have met their

21   burden of showing that they have been harmed by his use

22   of this -- of these documents.  And they've done a

23   review -- and I think had they -- I understand this is

24   an early stage, but they've done a big investigation,

25   your Honor, and their own papers not only don't they

 1    support the contention that they've been unharmed, they

 2    actually undercut it by explaining how the bid process

 3    works.

 4             THE COURT:  Okay.  And does First Republic

 5    want to be heard, because you're not a direct party, but

 6    you would be impacted by the injunction?

 7             MR. GURYAN:  Yes, I'd like to be heard.

 8        With respect to Katherine deWilde, it's clear in

 9    at least her affidavit that she has the authority or had

10    the authority to separate, not Mr. Rassiger.  That when

11    Customer A and Customer B approached them, um, she

12    decided to do a below-market offer to get the business.

13        This would be analogous to me having a mortgage

14    and going into another bank and saying, "Here's my

15    mortgage, here are my terms, can you do better?"  Would

16    the bank that issued the mortgage have a right to sue me

17    for revealing the terms?  Of course not.  That's absurd.

18             THE COURT:  Well, hold on just a second.

19    Where in her affidavit does she say that both A and B

20    initiated the contact?

21             MR. GURYAN:  No, what I said is in her

22    affidavit -- in Mr. Rassiger's declaration it's stated

23    that A initiated the contact after he left.

24             THE COURT:  Right, but that's -- when you --

25    what you said -- well, no, actually let me tell you what

you just said to me.  I can read it here on my

computer.  That's why I asked the question.  Sorry it

offended you.

You said:  "With respect to Katherine deWilde,

it's clear in at least her affidavit that she has the

authority, not Mr. Rassiger, and that when Customer A

and Customer B approached them, she decided."  So I

thought you were telling me something different than

what I understood.  But you don't take the position that

both A and B initiated the approaches?

MR. GURYAN:  I think we get that from

Mr. Rassiger's declaration and I think that Katherine

deWilde says that she was presented with the terms from

A and B and was asked could she do better and could she

meet it?  And one customer said they were going to go to

a private market and she decided to meet that.  And

Boston Private apparently met that and they got the

information the same way, by asking the customer what

the rate was, and met it and kept the client.  Customer

A, on the other hand, they were able to -- First

Republic was able to give a lower rate and got the

business.

This is what's called competition.  To me it's

not -- it's exactly what you would expect.

THE COURT:  It's exactly what you would expect

1    if Mr. Rassiger hadn't stole trade secrets.  Competition

2    is good, unfair competition's unlawful, and that's

3    what's got to get sorted out.

4         MR. GURYAN:  The other point I wanted to make,

5    though, is at this stage, for such an extraordinary

6    remedy, is it should be based on facts and there is no

7    -- it's speculation that she -- that that had any

8    influence on her decision.  As a matter of fact she says

9    it didn't --

10         THE COURT:  And where is she?

11         MR. GURYAN:  Where is --

12         THE COURT:  Yeah, Ms. DeWilde.

13         MR. GURYAN:  She's in California.

14         THE COURT:  You could have brought her.  Here,

15   inferences have to be drawn from circumstantial

16   evidence.  I've just spent several hours instructing on

17   this last week in Mr. DiMasi's case.

18       Help me with this.  And it's preliminary.  I have

19   to make preliminary determinations as Mr. Rassiger is

20   not going to testify.  It's my present view that his

21   testimony -- that his affidavit is not credible.  That

22   he -- as his discussions with First Republic were

23   evolving and maturing into an offer he systematically

24   took what he knew were trade secrets in violation of the

25   IT policy and the code of conduct policy of his

1    employer.  And I sit here with a kind of common-sense

2    question, "Why would somebody knowingly steal trade

3    secrets if he didn't intend to use them?"  "Why would he

4    steal them if they didn't have value in the industry as

5    he knows the industry much better than I know the

6    industry?"  What's the answer?

7              MR. GURYAN:  The answer is that there's no

8    evidence that the bank relied on them and it's -- and to

9    make that leap is speculative.  My point is that an

10   injunction is not necessary because for the last three

11   or more weeks the parties have been working diligently

12   to transfer whatever information.  The reason that the

13   bank proposal didn't come up yet is, one, we weren't a

14   party until recently, and, two, we hadn't gotten to

15   that.

16             THE COURT:  And I'm not deciding about the

17   proposal.

18             MR. GURYAN:  All I'm saying, your Honor, is

19   let us continue to discuss this.  We don't need an

20   injunction.  We're trying very hard to do it.

21             THE COURT:  I'm awfully busy and I frankly

22   hoped, if not thought that we wouldn't be here today.

23   But, you know, you have had an unusual amount of time,

24   because of my unavailability, to try to work this out

25   and you haven't done it yet.

1           MR. GURYAN:  Well, with respect to the visits

2     to the home, um, Mr. Glovsky said that that wasn't

3     satisfactory, but we have made offer after offer that

4     deals with personal information and they stopped the

5     discussion.

6           THE COURT:  And I'm not going to resolve that

7     today.  If I issue an injunction, you know, it will be

8     focused, but how -- you know, the discovery issues will

9     be handled in a more deliberate way.

10          MR. GURYAN:  The last point I would make is

11    that most of the points in the injunction other than

12    what I told you I objected to with its broadness is not

13    only covered by a litigation hold issue, "shall not

14    destroy," "shall not delete," um, but it's -- we have

15    put fences around information pursuant to that.  So

16    we've already done those things and an injunction is not

17    necessary.

18          THE COURT:  Okay.  Thank you.  Mr. Glovsky?

19          MR. GLOVSKY:  Yes, your Honor.

20          THE COURT:  One of the issues that's come into

21    sharper focus and it was already in focus somewhat for

22    me is, you know, what's -- how has this caused harm?

23    What's the evidence of use?  But you can address things

24    more generally.

25          MR. GLOVSKY:  Your Honor, with regard to

1   Customers A and B, I think Ms. DeWilde says all the

2   Court needs to know.  She says, in the second paragraph

3   of her affidavit, that she got information about the two

4   schools from Mr. Rassiger.  So so much for customers or

5   clients A and B.

6        There are also much bigger issues here at stake,

7   much bigger.  It's not just Customers A and B, it's not

8   even the 25 customers that Mr. Rassiger serviced when he

9   worked at Boston Private Bank.  It is the entire

10  portfolio of the commercial lending division of Boston

11  Private Bank.  Mr. Brown's second affidavit explains to

12  the Court that he isolated that document, sent it to one

13  of his two home e-mails, and still retains that document

14  today.

15       The issues in this case and the harm to the bank

16  and to its customers and God knows how many people out

17  there who he has information about, institutions and

18  individuals, that's what we're talking about.  We're not

19  talking about just A and B.  Although I think we've

20  shown, I think Ms. DeWilde has shown that, with regard

21  to A and B, the information came from Mr. Rassiger.  But

22  beyond clients A and B, there's C through Z and so on

23  and so forth, and all these individuals's information,

24  he stole.

25       So, you know, insofar as irreparable harm is

1    concerned, and not to mention the public interest, I

2    think it's overwhelming here, your Honor.  We have

3    someone who downloaded nine times, consciously

4    downloaded nine times, in voluminous information, much

5    of which was trade secret information.  That's conduct

6    which this court should not countenance for one second.

7        We also have a situation, your Honor, and I failed

8    to mention this earlier, but -- and we have an affidavit

9    that the Court would like to have to the effect that not

10   only did Mr. Rassiger take this information, but while

11   he was taking it he systematically categorized it by

12   client of Boston Private Bank.  He created folders in

13   his computer for each of those entities.  This was a

14   conscious defalcation and theft and an effort by

15   Mr. Rassiger to not just, you know, compromise Boston

16   Private Bank but to enhance his relationship with his

17   new employer.  First Republic is, I think, alone by

18   Ms. DeWilde's affidavit, is a party to that and either

19   its conduct nor his ought to be countenanced.

20           THE COURT:  All right.  Well, it's always my

21   goal to decide these matters orally, not casually, but

22   orally.  I've studied the submissions.  The arguments

23   have been helpful, but they haven't altered my tentative

24   view, although they will help me refine the scope of the

25   injunction.  But the motion for a preliminary injunction

 1   is hereby allowed.

 2        By way of background, since the transcript will be

 3   the detailed findings required, I'll say that on May 16,

 4   2011, the plaintiff, Boston Private Bank & Trust Company

 5   filed a complaint against defendant Todd Rassiger, the

 6   former Senior Vice-President at Boston Private who is

 7   now employed at First Republic Bank, a competitor of

 8   Boston Private, in the commercial loan market.

 9        On June 3rd, 2011, Boston Private filed an amended

10   complaint adding First Republic as a defendant.  The

11   amended complaint alleges Rassiger's violation of the

12   Federal Computer Fraud and Abuse Act, the CFAA, and also

13   contains eight state law claims against Rassiger,

14   particularly misappropriation of trade secrets, breach

15   of the fiduciary duty of loyalty, breach of contract,

16   breach of implied contract, breach of the implied

17   covenant of good faith and fair dealing, tortious

18   interference with contractual relations, tortious

19   interference with actual and/or prospective economic

20   advantage, and conversion.  The only claim against First

21   Republic is for conversion.  And yesterday on June 21, a

22   motion for a preliminary injunction directly against

23   First Republic was filed.  It has not yet been fully

24   briefed.

25        The standard for obtaining a motion for a

1    preliminary injunction is familiar but important.  The

2    burden of proof is on the plaintiff.  The Court is

3    required to weigh four factors.  The first is whether

4    the plaintiff has shown a likelihood of success on the

5    merits.  The second is whether the plaintiff has

6    established an imminent threat of irreparable harm in

7    the absence of a preliminary injunction.  The Court is

8    also required to balance the hardship to the plaintiff

9    if no injunction is issued against the hardship to the

10   defendants if the requested injunction is ordered.  In

11   addition, the Court must consider the effect of the

12   proposed injunction on the public interest.

13        The First Circuit has stated, on a number of

14   occasions, that the likelihood of success on the merits

15   is of primary importance, it is the sine qua non for

16   obtaining preliminary injunctive relief.  If a great

17   showing of likely success on the merits is made by a

18   plaintiff, a reduced showing of irreparable harm may be

19   appropriate, as the First Circuit has said in cases such

20   as **Ross-Simons**, 102 F. 3rd at 19 and **Astra**, 94 F. 3rd at

21   743.  In addition, a preliminary injunction is an

22   equitable remedy, it does not issue automatically, even

23   if the foregoing criteria indicate that an injunction is

24   warranted.

25        While the parties haven't addressed it, there's

1   also the requirement for a bond if an injunction issues

2   and I'll discuss that requirement after I explain my

3   ruling.

4        I find that the plaintiff has demonstrated a

5   likelihood of success on the merits of at least its

6   misappropriation of trade secrets and breach of

7   fiduciary duty claims, two of the three briefed in

8   connection with the motion for a preliminary

9   injunction.  I also find that the plaintiff is likely to

10  prevail on the Computer Fraud and Abuse Act claim, but

11  I'm not relying on that because I think there are some

12  complicated legal issues there.

13       With regard to misappropriation of trade secrets,

14  to establish a common law claim for misappropriation of

15  a trade secret the plaintiff must prove that, one, the

16  matter in question is a trade secret.  Two, it took

17  reasonable steps to preserve the matter's

18  confidentiality.  And three, the defendant utilized

19  improper means or participated in his own or another's

20  breach of a confidential relationship to acquire and use

21  the trade secret.  I wrote that in **Picker International,**

22  931 F. Supp. 18 at 35, summarizing the relevant

23  Massachusetts case law.

24       The statutory codification in Mass. General Law

25  Chapter 93, Section 42, of the tort of misappropriation

of trade secrets, "does not appear to alter the common

law prima facie elements for the tort," as Judge Skinner

wrote in **Data General**, 795 F. Supp. 501 at 507.  There

are generally six factors to consider to determine

whether something is a trade secret.  These are

described in **Jet Spray**, 361 Mass. 845 at 840.  I also

discuss them in **Picker.**  They're the Restatement of

Torts Section 757, Comment B, factors.  The key factor

in this case is whether Boston Private took adequate

measures to protect what it characterizes as a trade

secret.  And I predict, based on what I know, that it

will establish all of the criteria for a trade secret

including that requirement.

Mr. Rassiger worked for Boston Private Bank in

connection with its nonprofit clients.  His computer use

was governed by Boston Private's "IT Acceptable Use

Policy" and its conduct code.  The IT policy provides

that:  "All messages, files and attachments that are

created, composed, sent or received on the computer

equipment, electronic mail, or Internet systems, are and

remain the property of the bank."  The IT policy also

provides that confidential files and NonPublic Personal

Information, NPPI, must never be stored on portable

media devices such as USB flash drives.  Mr. Rassiger

electronically acknowledged receipt of the IT policy on

1    May 18th of 2010.

2         As a Boston Private employee Rassiger was also

3    subject to Boston Private's code of business conduct and

4    ethics, the "Conduct Code."  The Conduct Code provides

5    that all employees must act in the best interests of the

6    company and avoid situations that present a potential or

7    actual conflict between their personal interests and the

8    company's interests.  The code also prohibits employees

9    from using Boston Private property or information for

10   personal gain, from disclosing confidential information,

11   and the Conduct Code provides that upon leaving the

12   company employees must return to the company all

13   confidential and/or proprietary information of the

14   company in their possession.  For purposes of the

15   Conduct Code, "confidential information" includes all

16   nonpublic information that might be of use to

17   competitors or harmful to the company or its customers

18   if disclosed.  Rassiger electronically acknowledged

19   receipt of the Conduct Code on May 18th, 2010.

20        Rassiger was speaking to First Republic in

21   November of 2010 about possible employment with First

22   Republic.  He may have received a job offer informally

23   as early as November 15th, 2010.

24        Starting by November 9th, 2010, Rassiger

25   downloaded files from Boston Private Bank servers on at

1    least six dates and maybe nine times, or it appears,

2    it's argued nine times on those six dates, between

3    November 9th, 2010 and November 14th, 2010.  Rassiger,

4    between those dates, downloaded files from Boston

5    Private's server to a personal USB drive.  At least two

6    such downloads occurred after Rassiger received First

7    Republic's offer letter, formal offer letter on December

8    10th, 2010.  Boston Private has also discovered that

9    Rassiger e-mailed various Boston Private documents to

10   his personal e-mail accounts.  These documents and files

11   include the terms, conditions, structure and maturity

12   dates of particular bonds, loans or mortgages as well as

13   templates for such agreements, client-specific term

14   sheets, customer correspondence including commitment

15   letters, internal Boston Private guidelines for pricing

16   a tax-exempt bond and the financial model underlying

17   that pricing, spreadsheets containing lists,

18   confidential information and other client details for

19   existing and prospective customers for both the bank's

20   commercial lending division as well as its deposit and

21   cash-management division, board presentations made by

22   others including those outside the commercial lending

23   division, strategy documents such as strategic plans

24   developed in consultation with outside consultants to

25   whom the bank paid hundreds of thousands of dollars, and

1    detailed proprietary human resources leadership and

2    commercial lending documents.

3         In total it appears that Rassiger copied over 1500

4    documents including hundreds of confidential files.

5    Among these files are documents relating to the

6    customers, now characterized as private schools, and in

7    the papers referred to as "A" and "B," including their

8    credit applications, term sheets, balance sheets, and

9    loan agreements.  One of the files that Rassiger

10   evidently sent to his personal e-mail account is a

11   document identifying Customer A as a target to pursue.

12   Another is a document listing Boston Private's entire

13   commercial loan portfolio for 2010.

14        Rassiger claims that, quote:  "For the most part,

15   these company documents were unquestionably

16   nonconfidential and did not reflect protected trade

17   secrets or similarly classified information," end

18   quote.  He describes the bulk of the documents as

19   "personal documents," including "e-mails from my wife,

20   letters to my young children, correspondence with my

21   accountant, my tax returns, and information about my

22   taxes, information about my personal community

23   involvement, and our family Christmas card list."

24   However, in his declaration he states:  "When I was

25   compiling that personal information I copied certain

other documents that I had worked on or used at Boston
Private generally with the vague notion that such
documents might be useful solely as forms at some
undefined future time and place and/or because I was
proud of my efforts on the documents in question and
wanted to make sure I had them as some kind of
keepsakes."  He states:  "While I do not dispute Boston
Private's contention that I acknowledged a policy
regarding attachment of USB flash drives to my computer,
I was not conscious or deliberately attempting to
violate that or any other Boston Private policy when I
reviewed and copied the documents at issue."

Rassiger contends that the files he downloaded and
e-mailed to himself were not trade secrets and were
instead, quote, "concerned generic information regarding
loans, including terms, conditioned structure and
maturity dates, term sheets, correspondence, guidelines,
board presentations, and training documents."  Rassiger
also contends that Boston Private made insufficient
efforts to keep these files secret and that he was not
subject to any nondisclosure or noncompete or
nonsolicitation agreements.

But first I find that some of what Mr. Rassiger
characterizes as "generic" are trade secrets, um, but --
and I note these only to be representative.  The files

1    Rassiger downloaded and e-mailed to himself appear to

2    have been neither generic nor public.

3         For example, on December 8th, 2010, two days

4    before receiving an offer from First Republic, Rassiger

5    e-mailed himself a credit application for a $27.5

6    million bond submitted by a prospective Boston Private

7    customer, according to Brown's supplemental declaration,

8    Paragraph 6.  This application has been reviewed by a

9    Boston Private -- I'm sorry.  This application had been

10   reviewed by a Boston Private credit analyst and

11   contained a proprietary risk benefit assessment and an

12   evaluation of Boston Private's strategic relationship

13   with the prospective customer.  In addition, on January

14   24th, 2011, only weeks before resigning from Boston

15   Private, Rassiger e-mailed himself a file listing Boston

16   Private's entire commercial loan portfolio, including

17   customer names and risk ratings.  And Rassiger also

18   copied onto a USB drive credit applications submitted by

19   Customers A and B.  The copying of the entire commercial

20   loan portfolio, among other things, makes to me

21   Mr. Rassiger's contention that he wanted keepsakes of

22   his work product unconvincing.

23        As I noted earlier -- well, before we get to

24   that.

25        Moreover, on the present record, I find that

1   Boston Private took care to ensure the confidentiality

2   of the files I've just referenced and similar files.

3   Boston Private protects its computers and e-mail servers

4   with passwords and controls remote access to its servers

5   by requiring employees to apply for a remote

6   authorization password and token capable of generating

7   an authentification code.  In addition, Boston Private

8   utilizes a three-tiered document classification system

9   in which documents are categorized as "public,"

10  "internal," or "restricted," depending on the

11  sensitivity of the document's contents.

12      Per regulations posted on Boston Private's

13  Internet, employee access to internal and restricted

14  documents is limited and employees are prohibited from

15  storing any internal or restricted documents on their

16  computers or mobile devices.  In addition, employees are

17  only permitted to e-mail restricted documents via an

18  encrypted e-mail service and Boston Private maintains

19  its client records on a password-protected platform,

20  employee access to which is reviewed on a quarterly

21  basis.  Boston Private represents that many of the files

22  Rassiger downloaded or e-mailed to himself are

23  classified as "restricted" and contained nonpublic

24  personal information such as customer names paired with

25  a loan or an account number.  There's nothing that

1   refutes this contention.

2        In addition, Rassiger, as I said earlier, was

3   subject to the Boston Private IT policy and conduct code

4   which when observed provide protection for confidential

5   information.  As I noted earlier, I believe the IT

6   policy provides that all messages, files and attachments

7   that are created, composed, sent or received on the

8   computer equipment, electronic mail, or Internet

9   systems, are and remain the property of the bank and the

10  conduct code prohibits employees from disclosing

11  confidential information and provides that upon leaving

12  the company the employees must return to the company all

13  confidential and/or proprietary information of the

14  company in their possession.  Mr. Rassiger didn't do

15  this.  Basically I find that many of the files that

16  Mr. Rassiger took from Boston Private were trade

17  secrets.

18        At this hearing, counsel for Mr. Rassiger and for

19  the First Republic Bank argued that he did not use any

20  of the trade secrets that he took or may have taken, in

21  their view.  At the moment I don't find that it's likely

22  that that will be proven at trial.  There's basically no

23  reason to steal trade secrets, including the entire

24  commercial loan file of Boston Private, if somebody

25  experienced in the industry like Mr. Rassiger doesn't

1    feel it has commercial value and intends to use it.  As

2    I said, based on what's been presented to me, it doesn't

3    seem likely it would be found that he took these files

4    as mementos of his fine work for Boston Private.  He

5    took them because he thought they were valuable and it

6    would help his new employer.  And it's necessary at this

7    point, where there's not been any discovery, to rely

8    particularly perhaps on circumstantial evidence, but I

9    infer that being knowledgeable enough in the industry to

10   have been recruited by First Republic, Mr. Rassiger knew

11   what was useful and he took it because he intended to

12   use it and that contributes to my conclusion that he

13   did.  But there's also direct evidence.  The declaration

14   of August-deWilde, submitted by the defendants, says

15   that First Republic learned of interest rates that

16   Customers A and B were paying from both Mr. Rassiger and

17   the clients.

18        The facts I've just recited also indicate that the

19   plaintiff is reasonably likely to prevail on the breach

20   of fiduciary duty claims.  Basically to establish a

21   breach of fiduciary duty:  "A plaintiff must prove the

22   existence of a fiduciary duty, a breach of that duty,

23   causation and damages," as the Mass Appeals Court said

24   in **Hanover Insurance**, 46 Mass Appeals Court 153 at 164.

25        The existence of a fiduciary duty of loyalty is

1 presumed for management-level employees like

2 Mr. Rassiger.  As the Supreme Judicial Court said in

3 *Chelsea Industries*, 389 Mass 1 at 11:  "Employees

4 occupying a position of trust and confidence owe a duty

5 of loyalty to their employer, they must protect the

6 interests of the employer."  As the SJC said in *Augat*,

7 409 Mass 165 at 172 to 173, an employee may prepare to

8 compete with his employer while still employed provided

9 that in the course of such preparations he or she does

10 not otherwise act in violation of their fiduciary duty.

11 As the SJC put it:  "An at-will employee may properly

12 plan to go into competition with his employer and may

13 take active steps to do so while he is so employed.

14 There are, however, certain limitations on the conduct

15 of an employee who plans to compete with his employer,

16 he may not appropriate his employer's trade secrets, he

17 may not solicit his employer's customers while still

18 working for his employer, and he may not carry away

19 certain information such as lists of customers."  That's

20 *Augat*, 409 Mass 165 at 172 and 173, reiterating the

21 Restatement III of Agency, Section 8.03.

22     Here I find that the plaintiff is likely to prove

23 that Rassiger misappropriated trade secrets of Boston

24 Bank and used them to solicit Customers A and B, and

25 discovery will show whether, as may be the case, that

1  confidential information and trade secrets were used

2  more widely.

3      As I said earlier, I am not relying, in this

4  analysis, on the Federal Computer Fraud and Abuse Act

5  Claim.  The breach of fiduciary duty, if proven, may

6  well be enough to establish the CFFA claim on the prong

7  of exceeding authority, if the First Circuit's decision

8  in *EF-Cultural*, 274 F. 3rd at 581 to 582, predicts the

9  First Circuit's view on how the statute ought to be

10  interpreted, which is relatively broadly.  But it's not

11  essential to rely on the statute for the purposes of

12  deciding whether a preliminary injunction is

13  appropriate.  Since the plaintiff has made a strong

14  showing of the likelihood of success on the merits, a

15  reduced showing of the threat of irreparable harm is

16  permissible and I find, in this case, appropriate.

17      In this case, Mr. Rassiger, it appears on the

18  present record, has misappropriated trade secrets.  I

19  find that there would be no adequate remedy at law for

20  the use of those trade secrets, and subtle ways in which

21  the trade secrets could be used may be difficult to

22  discern and demonstrate.  But more particularly for

23  these purposes, the argument today indicates how hard it

24  might be to value the lost business or particularly the

25  loss of goodwill or the general head start that the

1   trade secrets could give First Republic, which is trying

2   to enter this new market.

3        With regard to the balance of hardships, it

4   heavily favors the plaintiff.  As I said, it could be --

5   it would be, I predict, irreparably harmed if its trade

6   secrets were used by a competitor.  There is no unfair

7   hardship to Mr. Rassiger or First Republic.  The order

8   I'll issue will be shaped to remove any unfair advantage

9   they have and require them to compete without the

10  benefit of Private Bank's confidential information,

11  which is the way they should have been competing from

12  Day 1.

13       I find the public interest is also served by the

14  issuance of the injunction.  Free and fair competition

15  is a very good thing, but people invest in developing

16  confidential information and trade secrets, the law

17  prohibits the misappropriation of them, and it's in the

18  public interest to enforce the law.

19       Now, the parties didn't -- so I am going to issue

20  a written preliminary injunction.  It will essentially

21  require the maintenance of the records that apparently

22  -- well, that I found, for present purposes, have been

23  misappropriated and prohibit their use by Mr. Rassiger

24  or anyone working in concert with him, including First

25  Republic.  There are some discovery issues and the

1   discovery issues I will refer to Magistrate Judge Boal

2   who will hear you on them, if you can't resolve them,

3   and you have made some progress, so perhaps you can

4   resolve them.

5       Under Rule 65(c), an injunction shouldn't issue

6   unless a bond in an appropriate amount is issued.  At

7   the moment -- in case it turns out that a party has been

8   wrongfully restrained.  At the moment I don't have any

9   evidence as to what the amount of the bond should be and

10  I may peg it at $25,000 or something like that, unless

11  somebody would like to be heard on the issue.

12          MR. GLOVSKY:  Well, as I recall the rule, your

13  Honor, it allows for a waiver of the bond and I think

14  that might be appropriate in this instance.

15          THE COURT:  I think you recall the rule from

16  when you worked in the Department of Justice.  It's only

17  the United States that's exempt from the bond

18  requirement.

19      All right.  Well, I'm going to impose a $25,000

20  bond.

21      I don't know whether I'm going to schedule the

22  rest of this case, discovery, right now or not, but I

23  think I will see the lawyers in the lobby.  When I do

24  schedule discovery, whether it's now or no later than

25  early August, I don't anticipate allowing a long period

1    for discovery.  I think it's important to all the

2    parties that this get resolved, if you can't resolve it

3    by agreement and it has to be litigated.  So I'm

4    thinking a couple of months, not a couple of years.  I

5    mean, there's a sharp focus to this and if Mr. Rassiger

6    and his new employer have, as it appears to me now,

7    trade secrets, they should be returned and any damages

8    should be determined.  On the other hand, if this

9    necessarily preliminary review on the limited record

10   doesn't predict the ultimate outcome, Mr. Rassiger and

11   First Republic ought to be able to get on with it

12   without the possibility chilling effect of this

13   litigation.

14       So it's 5 minutes of 12:00.  I'll see you in about

15   5 minutes in the lobby and I'll -- I will issue, of

16   course, a written order that defines the scope of the

17   preliminary injunction and puts everybody on clear

18   notice, but that will be later today.

19       The Court is in recess.  And the gentleman on the

20   phone should stay on the phone.  We'll be back to you

21   when we get to my lobby.  The Court is in recess.

22       And, actually, Mr. Brooks, if you want to bring

23   Mr. Rassiger back there, you're welcome to do that.

24            MR. BROOKS:  Okay.  Thank you, your Honor.

25            (Ends, 12:00 p.m.)

1

2                    C E R T I F I C A T E

3

4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

5    hereby certify that the foregoing record is a true and

6    accurate transcription of my stenographic notes, before

7    Chief Judge Mark L. Wolf, on Wednesday, June 22, 2011,

8    to the best of my skill and ability.

9

10

11   /s/ Richard H. Romanow 6-24-11
     _____
12   RICHARD H. ROMANOW  Date

13

14

15

16

17

18

19

20

21

22

23

24

25